UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAMAR SHAW,

          Plaintiff,

   v.

UNITED STATES OF AMERICA, et al.,

          Defendants.

Case No. 18-cv-06243-PJH

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AS TO OCEAN DUCHESS, INC. AND
OCEAN SHIPHOLDINGS, INC.**

Re: Dkt. No. 51

      Defendants' motion for summary judgment in favor of Ocean Duchess, Inc.

("Ocean Duchess") and Ocean Shipholdings, Inc. ("Ocean Shipholdings") came on for

hearing before the court on January 22, 2020. Plaintiff Damar Shaw appeared through

his counsel, Nicholas Neidzwski. Counsel for the United States, Eric Kaufman-Cohen,

appeared on behalf of defendants. Having reviewed the papers filed by the parties and

carefully considered their arguments and the relevant legal authority, the court hereby

GRANTS defendants' motion, for the reasons set forth below.

## BACKGROUND

### A.    Procedural History

      On October 12, 2018, plaintiff Damar Shaw filed this action against defendants

United States of America, Ocean Shipholdings, Inc. and Ocean Duchess, Inc. Dkt. 1

(Compl.). Plaintiff alleges that he was injured while working aboard a ship called the SS

ALGOL, which is owned by the United States. The vessel is operated on behalf of the

United States by Ocean Duchess, a Subchapter S corporation, incorporated in the state

of Delaware. Dkt. 54 (James Decl. ISO Mot. Summ. J.) ¶ 2. Ocean Shipholdings is a

1    corporation incorporated in Delaware. Dkt. 64 (Neidzwski Decl. ISO Opp.), Ex. 3 (James.

2    Dep.) at 42

3       The United States filed a motion to dismiss this action as against Ocean Duchess

4    and Ocean Shipholdings, dkt. 13, which the court denied by order entered January 18,

5    2019. The court found that the plaintiff sufficiently invoked federal jurisdiction over the

6    maritime claims against defendants Ocean Duchess and Ocean Shipholdings because

7    the complaint sufficiently alleged that they were acting outside the scope of their agency

8    relationship with the United States when plaintiff was injured. Dkt. 32. In the order

9    denying the motion to dismiss, the court noted that the factual question of agency may be

10    appropriate for an early summary judgment motion after discovery on the issue. Dkt. 32

11    at 6 n.3.

12       Plaintiff filed a seaman's first amended complaint, dkt. 35, on January 30, 2019.

13    The government filed an answer on behalf of all defendants on February 6, 2019. Dkt.

14    39. Plaintiff asserts three claims against all defendants: (1) negligence under the Jones

15    Act, 46 U.S.C. § 30104; (2) unseaworthiness; and (3) failure to pay maintenance, cure,

16    and wages under maritime law. Plaintiff also asserts a claim of gross negligence against

17    Ocean Duchess and Ocean Shipholdings. Shaw seeks general damages against all

18    defendants, as well as attorneys' fees and punitive damages against Ocean Duchess and

19    Ocean Shipholdings.

20       The United States now moves for summary judgment in favor of defendants

21    Ocean Duchess and Ocean Shipholdings on all claims. Dkt. 51 ("Mot."). Plaintiff timely

22    filed an opposition, dkt. 62 ("Opp."), and the United States filed a reply, dkt. 65 ("Reply").

23    **B.    The Underlying Incident**

24       On May 27, 2018, plaintiff was aboard the SS ALGOL working as a General Utility

25    Deckhand and Engineer. The ALGOL is owned by the United States, by and through the

26    Department of Transportation, Maritime Administration ("MARAD"), and operated by

27    Ocean Duchess under a ship management contract with MARAD. Plaintiff was employed

28    by Ocean Duchess as a crew member of the ALGOL. James Decl. ¶¶ 7, 8. The ALGOL

was docked at Pier 80 in San Francisco next to another ship operated by Ocean Duchess, the SS CAPELLA. The ALGOL and CAPELLA are vessels in the Ready Reserve Force ("RRF"), the high readiness subset of vessels in the MARAD National Defense Reserve Fleet ("NDRF"). The RRF was established in 1976 to support the rapid deployment of the United States' military forces, equipment, and supplies. The RRF is also subject to operations of the Department of the Navy's Military Sealift Command, and RRF ships are expected to be fully operational and able to respond to national security and other needs within a relatively short and specified length of time. See dkt. 55 (Simmons-Healy Decl. ISO Mot. Summ. J.), Ex. A at 23.

On May 23, 2018, an order was issued by the Military Sealift Command for a "Turbo Activation" of the CAPELLA, which is like a dress rehearsal for an actual activation. Dkt. 57 (Ryan Decl. ISO Mot. Summ. J.) ¶ 2 and Ex. A (Turbo Activation order TA 18-3A for CAPELLA and two other vessels). "A turbo activation tests the readiness of Ready Reserve Fleet vessels to ensure that the vessels are capable of activation on short notice." Id. ¶ 2.

As part of the activation on May 27, 2018, the ALGOL had to be moved from its berth at Pier 80 so that the CAPELLA could depart from its berth behind the ALGOL. Ryan Decl. ¶ 3. Ocean Duchess conducted the activation of the CAPELLA and movement of the ALGOL pursuant to its ship management contract with MARAD. Ryan Decl. ¶ 4.

After the CAPELLA departed, the ALGOL was moved back to its mooring position at Pier 80 with the assistance of tugboats and the crew began to tie up the vessel. See Neidzwski Decl., Ex. 1 (Shaw Dep.) at 82. At approximately 2:20 p.m., a mooring line between the pier and the ship snapped and struck Shaw and his supervisor Gary Vargas, causing various severe injuries, including a left tibial plateau fracture, left knee dislocation, and injuries to Shaw's head, right wrist, and left shoulder.

Plaintiff was transported to Zuckerberg San Francisco General Hospital & Trauma Center and remained there from May 27 through June 29, 2018, undergoing multiple

surgeries for his left knee and leg.  Plaintiff thereafter continued to receive in-patient, 24/7 care from other providers until July 17, 2018.

Following the incident, plaintiff submitted a claim for personal injury and wages to the United States.  After the United States denied the claim, plaintiff filed this action.

**C.    ALGOL Operations Before the Incident**

The parties submitted detailed evidence about the management and operation of the ALGOL before the incident happened.  The key undisputed details are summarized here.

### 1.    Request to Replace Mooring Lines Before the Incident

Under the Ship Manager Contract between MARAD and Ocean Duchess, the mooring lines are considered "Government Furnished Property."  Simmons-Healy Decl. ¶ 5 and Ex. B.

Ocean Duchess is required to formulate a business plan (BP) for the ALGOL two years prior to the fiscal year it covers under a three-step process that requires (1) an initial BP; (2) a final BP; and (3) an approved baseline BP which becomes the operable BP for its designated fiscal year.  MARAD has final say over what items, including maintenance and repair, actually get funded and accomplished under the approved baseline BP.  Dkt. 53 (Weigand Decl. ISO Mot. Summ. J.) ¶¶ 2–4.

The first time mooring lines were identified in the Business Plans as needing replacement was in the initial BP for FY 2018, submitted by Ocean Duchess on April 13, 2017.  The date of that particular entry was November 16, 2016, with an anticipated schedule of January 3, 2018, for the first phase of replacement of mooring lines.  The comments state, "The old lines are more than 40 years old, worn and difficult to handle." Weigand Decl., Ex. A.

In the final BP submitted June 29, 2017, the anticipated scheduling for Phase 1 of replacing mooring lines is moved up to December 11, 2017, and the comments state, "The old lines are more than 40 years old, worn, difficult to handle and create unnecessary danger for deck crew."  Weigand Decl., Ex. B.

Mooring line replacement remained on the approved baseline BP with a revised anticipated scheduling date of January 3, 2018, and revised comment, "The old lines are more than 40 years old, worn, difficult to handle and create unnecessary danger for deck crew Regulatory Requirement." Weigand Decl., Ex. C. These comments were entered by Steve Converse, Ocean Duchess's port engineer for the ALGOL. Mot. at 8.

No funds were appropriated by MARAD for the purchase of new lines for the first phase of replacing mooring lines that was scheduled for January 3, 2018, because MARAD's budget was under a continuing resolution. The funds to purchase the first round of new mooring lines were approved by MARAD on May 17, 2018. The first set of new lines were not delivered to the ship until August 28, 2018, after plaintiff's injury on May 27, 2018. Mot. at 10.

### 2. Crewing of the ALGOL for Turbo Activation of the CAPELLA

Prior to the turbo activation of the CAPELLA, Ocean Duchess port engineer Steve Converse requested eight line handlers, but only six were available because the turbo activation was scheduled for Memorial Day weekend. Mot. at 11–12.

### D. Investigation of the Incident

The Coast Guard investigated the incident and issued an incident investigation report. Dkt. 63 (Crawford Decl. ISO Opp.), Ex. G. As a result of its investigation, the Coast Guard issued two "No Sail Orders" for the ALGOL and CAPELLA based on the conditions of both vessels' lines. MARAD was required to replace the lines on both ships to clear the No Sail Orders. Mot. at 10. On July 3, 2018, in response to the No Sail Orders, Ocean Duchess initiated a Streamlined Approval Process (SLAP) to request funding for new lines for both vessels. Weigand Decl. ¶ 11 and Ex. F. A SLAP is used when funding is needed on an expedited basis to remedy a condition of a vessel that could interfere with its readiness. Weigand Decl. ¶ 11. The funding was approved by MARAD on July 15, 2018. Weigand Decl. ¶ 12.

Ocean Duchess's vice president of operations, Bob Sheen, directed Captain Paul Pettibon to conduct an investigation. He completed his report within two weeks of the

incident.  Opp. at 11.  Plaintiff's liability expert Captain Thomas Crawford conducted an investigation in February 2019.  Opp. at 11 and Crawford Decl. ¶¶ 8, 9.

**E.    Ocean Duchess's Ship Manager Contract**

On January 22, 2016, Ocean Duchess was awarded a ship manager contract by MARAD to crew, maintain and operate the SS ALGOL and the SS CAPELLA.  Simmons-Healy Decl. ¶ 2 and Ex. A ("Ship Manager Contract").

**1.    Agency Provision**

The ship manager contract between the United States and Ocean Duchess provides as follows at ¶ G.8.1.1:

> The ship manager is considered the agent of the United States within the meaning of the Suits in Admiralty Act (SIAA), the Public Vessels Act, and the Admiralty Extension Act for **all third party tort actions in admiralty cognizable including those under the Jones Act, General Maritime Law, or Clarification Act,** inclusive of claims for maintenance and cure. Such actions include, but are not limited to, claims for death or injury to crew members or invitees, claims for maintenance and cure, claims for illness to crew members, and claims for property damage to third parties.

Ship Manager Contract at 123 (emphasis added).

The contract, ¶ G.8.1.1.1, specifies two circumstances under which Ocean Duchess, as the ship manager, would not be considered an agent of the United States: (1) contract disputes and (2) non-admiralty actions.

> The ship manager is not an agent of the United States under the Contract Disputes Act and nothing contained herein shall be deemed to extend to the ship manager the status of "agent of the United States" under any laws relating to contracts. (see Section G.8.2)  Neither is the ship manager an agent of the United States for non-admiralty actions, particularly employer/employee disputes. (see Section G.8.3)

Ship Manager Contract at 123.

**2.    Exclusivity and Duty to Defend Provisions**

The contract further provides, at ¶ G.8.1.2, that the United States is the exclusive defendant for covered admiralty cases related to the activities of its agents:

Actions covered by G.8.1.1 must be brought exclusively against the United States. See the Suits in Admiralty Act (SIAA) 46 U.S.C. § 30903 et seq., which makes the United States the exclusive defendant for all admiralty cases related to the activities of its agents.

Ship Manager Contract at 123.  The contract also requires the United States to defend the ship manager in covered admiralty actions:

The United States will defend the ship manager in actions covered by Section G.8.1.1.  Such defense will usually be provided through the United States Department of Justice.  By entering into this contract, the ship manager hereby agrees to accept the representation of the United States in such legal proceedings. . . .

Id. at ¶ G.8.1.3.  Under the contract, the United States bears sole financial risk for all covered admiralty actions except as set forth in the Indemnification provision at ¶ G.8.4 of the contract:

Except as set forth in Section G.8.4, Indemnification, the United States bears the sole financial risk for all actions covered by Section G.8.1.1, for which the RRF vessel, the United States, or the ship manager is liable provided the liability arose out of the ship manager's performance of this contract and the ship manager was acting within the scope of this contract.

Id. at ¶ G.8.1.4.

**3.    Indemnification Provision**

The contract provides at ¶ G.8.4.1 that the ship manager will indemnify the United States under specified circumstances including, as relevant here, gross negligence or willful misconduct by, or with the privity or knowledge of, the ship manager's senior management:

G.8.4 INDEMNIFICATION

G.8.4.1.  Notwithstanding anything in this contract to the contrary, particularly Section G.8, the ship manager agrees to indemnify and hold the United States, MARAD, and its employees and agents harmless from any damages, loss, or injury resulting either directly or indirectly from:

(a) acts of Gross Negligence, Willful Misconduct or Violation of Law or Regulations of the Senior Management of the ship

7

manager; or

> (b) acts of Gross Negligence, Willful Misconduct or Violation of Law or Regulations performed by employees, servants, contractors, subcontractors, suppliers or agents of the ship manager and which occurred with the Privity or Knowledge of the Senior Management of the ship manager . . . .

Ship Manager Contract at 126. Under the terms of the contract, "[s]uch indemnification shall be provided upon MARAD's request or, if necessary, the United States may bring a legal action . . . ." Id. at ¶ G.8.4.2.

The contract defines "Senior Management" and other key terms of the indemnification provision:

> (a) Senior Management means those individuals responsible for senior management of the ship manager's organization with respect to major components of any of its operations relating to the NDRF or RRF vessels. Senior Management will include the chief executive officer, president, vice president(s), and head(s) of vessel operations.
>
> (b) Privity or Knowledge means that the relevant individuals had either personal cognizance of the circumstances, which either caused or contributed to the claim or the means to obtain that knowledge of which such person should have availed itself.
>
> (c) Gross Negligence means harm that is caused by an extreme departure from the care required under the circumstances or a failure to exercise even slight care.
>
> . . .
>
> (f) Willful Misconduct means conduct that is either intentional or committed under circumstances exhibiting a reckless or wanton disregard for the probable consequences.

Id. at ¶ G.8.4.3.

### 4. Government Furnished Property

Under the ship management contract between MARAD and Ocean Duchess, mooring cables and lines on the ALGOL are defined as Government Furnished Property, and not considered property of Ocean Duchess. Simmons-Healy Decl. ¶ 5 and Ex. B (Attachment TE-22 to the ship management contract).

**F.      Ocean Shipholdings' General Agency Agreement**

Ocean Shipholdings is a General Agent of MARAD by way of a General Agency Agreement entered on April 10, 1992.  Simmons-Healy Decl. ¶ 6 and Ex. C.  The General Agency Agreement provides that Ocean Shipholdings is responsible for operating government-owned vessels that MARAD may assign to it for urgent or compelling reasons, but does not cover MARAD vessels in the Ready Reserve Fleet such as the ALGOL.  Simmons-Healy Decl. ¶¶ 7–8 and Ex. C.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial.  The moving party need only demonstrate to the court that there is an absence of evidence to support the non-moving party's case.  Id. at 325.

Once the moving party has met its burden, the burden shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'"  T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.1987) (citing Celotex, 477 U.S. at 324). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor.

Id. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Id. However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. Thornhill Publ'g Co., Inc. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979). Moreover, the evidence the parties present must be admissible. Fed. R. Civ. P. 56(c)(2).

**DISCUSSION**

**A.    Ocean Duchess As an Agent of the United States**

**1.    Plaintiff's Claims Lie Exclusively Against the United States, Not Its Agents**

The government moves for summary judgment in favor of Ocean Duchess on the ground that Ocean Duchess is an agent of the United States and that plaintiff's claims may be brought solely, and exclusively, against the United States, and not against its agents, under the exclusivity provision of the Suits in Admiralty Act, 46 U.S.C. § 30901 et seq. ("SIAA"). Plaintiff contends that there is a triable issue as to whether Ocean Duchess acted outside the scope of its agency for the United States by its failure to meet its contractual duties and by its gross negligence in causing plaintiff's injuries.

**a.    Exclusivity Provision of the Suits in Admiralty Act**

The SIAA, together with the Clarification Act, 50 U.S.C. §§ 4701–4705, waive sovereign immunity for the United States in cases where "a civil action in admiralty could be maintained" against a private person in the same situation. 46 U.S.C. § 30903(a). If a vessel is owned by the United States, and someone is harmed by the vessel or one of its employees, then the person must bring any admiralty claim against the United States rather than the ship's operator, including claims under the Jones Act brought by a seaman injured in the course of employment. Id.; see Ali v. Rogers, 780 F.3d 1229, 1233 (9th Cir. 2015); Dearborn v. Mar Ship Operations, Inc., 113 F.3d 995, 996 (9th Cir. 1997) (through the SIAA, government is subject to "the same liability ... as is imposed by the

admiralty law on the private shipowner"). "In plain terms, the SIAA applies when (1) a vessel is owned by the United States or operated on its behalf, and (2) there is a remedy cognizable in admiralty for the injury." <u>Ali</u>, 780 F.3d at 1233.

The Clarification Act provides in pertinent part:

> Officers and members of crews ... employed on United States or foreign flag vessels … through the War Shipping Administration shall, with respect to ... (2) death, injuries, illness, maintenance and cure, loss of effects, detention, or repatriation … and (3) collection of wages have all the rights, benefits, exemptions, privileges, and liabilities, under law applicable to citizens of the United States employed as seamen on privately owned and operated American vessels.... Any claim referred to [hereinabove] shall be enforced pursuant to the provisions of the [SIAA].

50 U.S.C. § 4701. The SIAA in turn provides in relevant part:

> [I]f a remedy is provided by this chapter, it shall be exclusive of any other action arising out of the same subject matter against the officer, employee, or agent of the United States. . . whose act or omission gave rise to the claim.

46 U.S.C. § 30904 (formerly codified at 46 U.S.C. § 745).

### b. Ninth Circuit Authority Applying the SIAA

The Ninth Circuit has squarely held under the SIAA that "'where a remedy lies against the United States, a suit against an agent of the United States by reason of the same subject matter is precluded.'" <u>Ali</u>, 780 F.3d at 1233 (quoting <u>Dearborn</u>, 113 F.3d at 997) (internal marks omitted).

The remedy available against the United States "need not be the same as that available against a private party for this provision [section 30904 of the SIAA] to apply." <u>Ali</u>, 780 F.3d at 1234 (citation omitted). In <u>Ali</u>, plaintiffs attempted to evade the exclusivity provisions of the SIAA and its preclusion of suit against the United States' agents by purposely not alleging jurisdiction under the SIAA, but instead asserting violations of the Civil Rights Act and other causes of action alleged to be outside admiralty jurisdiction. The Ninth Circuit rejected the attempt, explaining that despite plaintiffs' attempts to plead around and avoid admiralty jurisdiction and the applicability of the SIAA, the complaint's

1    allegations could have allowed admiralty claims to be stated.  The court held that

2    because a claim pertaining to a United States vessel could have been asserted in

3    admiralty, the SIAA's exclusivity provision controlled and required dismissal of all claims

4    against the ship manager's employees.  Id. at 1236–37.

5            2.      **Ship Manager Contract Between Ocean Duchess and the United**

6                    **States Covers Gross Negligence**

7            Plaintiff concedes that Ocean Duchess is an agent of the United States under the

8    Ship Manager Contract, but contends that the acts and/or omissions by Ocean Duchess

9    that caused plaintiff's injuries were outside the scope of the contract, such that Ocean

10   Duchess was not an agent of the United States with respect to those acts and/or

11   omissions, and plaintiff's claims against Ocean Duchess therefore fall outside the scope

12   of the SIAA's exclusivity provision.  Opp. at 24.

13           In determining whether agency exists for purposes of the SIAA, courts in the Ninth

14   Circuit "use the common law definition of agency as a starting point for our analysis and

15   will then consider the relevant case law as well as the specific provisions of the

16   agreement between" the United States and the ship operator.  Dearborn, 113 F.3d at

17   997.  "The Restatement of Agency defines an agency relationship as 'the fiduciary

18   relation which results from the manifestation of consent by one person to another that the

19   other shall act on his behalf and subject to his control, and consent by the other so to

20   act.'"  Id. (quoting Restatement (Second) of Agency § 1(1) (1958)).  "Two characteristics

21   appear most often to be dispositive" in cases concerning the SIAA:  "in order to find that a

22   charterer is an agent of the United States, (1) the United States must exercise significant

23   control over the charterer's activities—either day to day control or overall control and

24   direction of the mission, and (2) the charterer must be engaged in conducting the

25   business of the United States."  Dearborn, 113 F.3d at 997–98 & n.3 (noting such

26   considerations under the SIAA may make agency "apply more broadly in this context

27   than it does elsewhere").

28           Plaintiff does not dispute that Ocean Duchess has an agency relationship to the

1  United States under the Ship Manager Contract.  But looking to the provisions of that

2  contract, plaintiff urges a reading of the indemnification provision, which requires Ocean

3  Duchess to indemnify the United States from liability for certain "acts of Gross

4  Negligence," as a condition on the scope of the agency agreement, such that "gross

5  negligence" falls outside the protection of the contract and the agency relationship.  Opp.

6  at 24–25 (citing Ship Manager Contract ¶ G.8.4).

7        The United States responds that this indemnification provision allocates financial

8  responsibility for claims resulting from acts of gross negligence, willful misconduct or

9  violations of law or regulations by, or with the privity or knowledge of, senior

10 management, but does not negate or carve out an exception to the agency provision of

11 ¶ G.8.1.1, which provides that Ocean Duchess "is considered an agent of the United

12 States" for all third party tort actions in admiralty, "including those under the Jones Act,

13 General Maritime Law, or the Clarification Act."  Reply at 7-8.  The United States points

14 out that ¶ G.8.1.1.1 of the Ship Manager Contract expressly identifies two circumstances

15 where Ocean Duchess "is not an agent of the United States" under the contract:

16 (1) disputes under the Contract Disputes Act and under laws relating to contracts; and

17 (2) third party non-admiralty actions, particularly employer/employee disputes.  Reply at

18 6.  By a plain reading of the Ship Manager Contract, there is no gross negligence

19 exception to the agency status of Ocean Duchess as to third party tort claims.

20        Plaintiff offers no authority to support his argument that the indemnification clause

21 creates a genuine dispute on the question whether acts of gross negligence by Ocean

22 Duchess fell outside the scope of its agency relationship with the United States.  A similar

23 argument was rejected by the Ninth Circuit in Dearborn, where the plaintiff argued that

24 the indemnification provision of a contract to operate a naval ship owned by the United

25 States demonstrated that the ship operator was not an agent of the United States for

26 purposes of the SIAA.  113 F.3d at 1000.  In Dearborn, the Ninth Circuit reviewed an

27 order finding as a matter of fact on summary judgment that the defendant was operating

28 as an agent of the United States.  The only evidence presented was the agreement

13

between the United States and the ship's operator.  Id. at 998.  The court reviewed the contract and concluded that its terms clearly defined an agency relationship, finding that the ship operator "was employed to operate the [ship] in the business of the United States, and, although it did not reserve the right to hire or fire individual crew members, the United States retained significant overall direction and control over the operation of the vessel."  Dearborn, 113 F.3d at 999.

In Dearborn, the plaintiff argued unsuccessfully that the indemnification clause, which required the ship operator to secure insurance coverage in the amount of $100 million per incident and indemnify the government from all liability covered by the insurance policy, demonstrated that the parties intended that the ship operator, not the government, would be responsible for any liabilities arising from the operation of the naval ship.  113 F. 3d at 1000.  The Ninth Circuit rejected that argument, reasoning that "[n]ot only do the insurance provisions not alter the nature of what otherwise seems to be a fairly clear agency relationship between the government and Bay Ship, but they appear to assume that actions will lie against the government and that the government will defend and control the litigation."  Id.

Similarly, the indemnification provision of the Ship Manager Contract does not alter Ocean Duchess's agency relationship with the United States, but assumes that the government will defend and control the litigation, as reflected in the following provisions of the parties' agreement:

  i. "[a]ctions covered by G.8.1.1 [for all third party tort actions in admiralty] must be brought exclusively against the United States,"

  ii. "the United States will defend the ship manager in actions covered by Section G.8.1.1;"

  iii. "the United States will control the conduct of the litigation;" and

  iv. "[e]xcept as set forth in Section G.8.4, Indemnification, the United States bears sole financial risk for all actions covered by Section G.8.1.1."

Ship Manager Contract ¶¶ G.8.1.2–G.8.1.4.  Read in context with these provisions of the Ship Manager Contract, the indemnification clause does not raise a genuine dispute of

14

1  material fact as to whether Ocean Duchess operates the ALGOL as an agent of the

2  United States or whether plaintiff lacks a direct right of action against Ocean Duchess,

3  where the Contract provides that tort claims in admiralty will lie against the United States

4  and that the United States is entitled to seek indemnity from Ocean Duchess for claims

5  covered by the indemnification clause, including certain acts of gross negligence by, or

6  with the privity or knowledge of, its senior management.  See, e.g., United States v. Tug

7  Manzanillo, 310 F.2d 220, 220 (9th Cir. 1962) (affirming grant of indemnity in action by

8  the United States against third party to recover payments made by the government to an

9  injured ship captain for maintenance and cure).  The contractual provision that "[s]uch

10  indemnification shall be provided upon MARAD's request or, if necessary, the United

11  States may bring a legal action," further reflects the parties' intent that gross negligence

12  claims and other third party actions covered by the indemnification clause would be

13  brought exclusively against the United States and would not be brought directly against

14  Ocean Duchess.  Ship Manager Contract ¶ G.8.4.2.

15  Extending the reasoning of Dearborn, the court finds that there is no triable issue

16  whether the indemnification provision carves out an exception to the agency agreement

17  for acts of gross negligence.  As a matter of law, Ocean Duchess was an agent of the

18  United States with respect to plaintiff's claims for purposes of the SIAA.

19  **B.    Ocean Shipholdings As a Third Party**

20  **1.    Ocean Shipholdings Is Not an Agent of the United States With Respect**

21  **to Plaintiff's Claims**

22  In moving for summary judgment in favor of Ocean Shipholdings, the government

23  has abandoned the theory asserted on its motion to dismiss that Ocean Shipholdings is

24  an agent of the government and therefore barred from suit under the exclusivity provision

25  of the SIAA.  The government now asserts that Ocean Shipholdings has a General

26  Agency Agreement with MARAD that does not cover the operation and/or management

27  of Ready Reserve Fleet vessels such as the ALGOL.  Mot. at 12–13.

28  The United States provides evidence to show that Ocean Duchess is an affiliate of

1  Ocean Shipholdings and is a separate and distinct Subchapter S corporation, with

2  separate bank accounts and separate lines of credit.  Mot. at 13.  Ocean Shipholdings

3  does not guarantee or provide insurance for performance of the work under the Ship

4  Manager Contract between Ocean Duchess and MARAD.  James Decl. ¶¶ 5–6.  Further,

5  the crew of the ALGOL are employed by Ocean Duchess and are members of the

6  Seafarer's International Union ("SIU"), which has entered into successive collective

7  bargaining agreements with Ocean Duchess to cover crew members assigned by Ocean

8  Duchess to the ships covered by its ship manager contract with MARAD, and Ocean

9  Shipholdings is not a signatory to the SIU collective bargaining agreement.  Id. ¶ 7.  In

10  light of the evidence showing that Ocean Shipholdings is not an agent of the United

11  States for purposes of plaintiff's claims for injuries while he was employed as a

12  crewmember of the ALGOL, the United States argues that there is no evidence to show

13  that Ocean Shipholdings played any role in the operation and management of the ALGOL

14  or owed plaintiff a duty of care to support the maritime claims against Ocean

15  Shipholdings as a third party.  Mot. at 21.

16      Plaintiff does not dispute that Ocean Shipholdings was not an agent of the United

17  States under the SIAA with respect to the ALGOL but asserts that Ocean Shipholdings is

18  liable for his injuries as a third party non-employer.  Opp. at 21.  Plaintiff acknowledges

19  the evidence showing that with respect to the ALGOL, there is no contractual or agency

20  relationship between Ocean Shipholdings and the United States, nor does MARAD or the

21  United States owe a duty to defend Ocean Shipholdings from a lawsuit in relation to an

22  incident aboard the ALGOL.

23      **2.      Negligence and Gross Negligence Claims Against Ocean**

24          **Shipholdings**

25      Because Ocean Shipholdings is not plaintiff's employer or an agent of the United

26  States under the SIAA, plaintiff represents that he will amend his Jones Act negligence

27  claim as against Ocean Shipholdings to a general maritime negligence claim against

28  Ocean Shipholdings, where the allegations of negligence will remain the same, but

1    without the reference to the Jones Act.  Plaintiff also concedes that dismissal of his

2    unseaworthiness and maintenance and cure claims against Ocean Shipholdings is

3    warranted.  Opp. at 22.

a.    **No Evidence to Raise Triable Issue Whether Ocean**

**Shipholdings Owed Duty to Plaintiff**

6         To establish a negligence claim under general maritime law, the basic elements

7    are similar to those required for a common law claim of negligence: "a duty, a breach of

8    the duty, proximate cause, and damages." Prince v. Thomas, 25 F. Supp. 2d 1045, 1047

9    (N.D. Cal. 1997).  A "duty of reasonable care under the circumstances" applies in

10   maritime negligence actions.  Christensen v. Georgia-Pac. Corp., 279 F.3d 807, 815 (9th

11   Cir. 2002) (citing Peters v. Titan Nav. Co., 857 F.2d 1342, 1345 (9th Cir. 1988)).  Gross

12   negligence is defined as "'the intentional failure to perform a manifest duty in reckless

13   disregard of the consequences as affecting the life or property of another; such a gross

14   want of care and regard for the rights of others as to justify the presumption of willfulness

15   and wantonness.'" Royal Ins. Co. of Am. v. Sw. Marine, 194 F.3d 1009, 1015 (9th Cir.

16   1999) (citing Black's Law Dictionary 1185 (4th ed. 1968)).

17        The government focuses its argument on the absence of evidence that Ocean

18   Shipholdings played any role in the management and operation of the ALGOL, to negate

19   any duty of care owed to plaintiff.  The United States asserts that Ocean Shipholdings

20   "has no relationship to the [ALGOL]" and cites evidence showing that Ocean

21   Shipholdings is merely an "umbrella brand."  Reply at 10–13.  The United States further

22   asserts that Ocean Duchess, like other affiliated companies, is organized as a separate

23   entity within the Ocean Shipholdings umbrella brand. Id.  Plaintiff responds that Ocean

24   Shipholdings owed a duty of care to plaintiff arising from its actions and conduct with

25   respect to the ALGOL.

26        Plaintiff points to some evidence of Ocean Shipholdings' activity to refute the

27   government's blanket statement that Ocean Shipholdings has "no relationship" to the

28   ALGOL, such as listing the ALGOL on its website; receiving audit reports for the ALGOL;

17

getting involved in the investigation of the May 27, 2018, incident; and providing forms and safety protocols used by Ocean Duchess. Plaintiff also points out that Ocean Duchess and Ocean Shipholdings share the same group of senior management, share the same office address in Houston, Texas, and use email addresses with the Ocean Shipholdings domain name. Despite Ocean Shipholdings' lack of a contractual or agency relationship to the government with respect to the ALGOL, plaintiff contends that Ocean Shipholdings was involved in the management of the ALGOL, to raise a dispute of material fact whether Ocean Shipholdings operated or managed the ALGOL and whether any act or omission by Ocean Shipholdings caused or contributed to plaintiff's injuries. Opp. at 7–8.

It is undisputed that Ocean Shipholdings and Ocean Duchess are affiliated companies, but the evidence does not show that Ocean Shipholdings had a role in managing or operating the ALGOL. The United States points to evidence explaining that the corporate structures of the Ocean Shipholdings-affiliated companies have been disclosed to, and audited by, the Department of Defense as part of the process to bid for government contracts. For example, Ocean Duchess is the affiliate that deals with MARAD contracts and Ocean Ships, Inc. is the affiliate that deals with Military Sealift Command (MSC). Dkt. 65-1 (Kaufman-Cohen Decl. ISO Reply), Ex. D (Sheen Dep.) at 180. Ocean Duchess's CFO states that Ocean Shipholdings has separate bank accounts and separate lines of credit from Ocean Duchess, and is not a guarantor of the Ship Manager Contract between Ocean Duchess and MARAD. James Decl. ¶¶ 4, 6.

Plaintiff points out contradictions among the testimony of defense witnesses, including upper management, about which company was their employer and which company was the employer of others involved with the operation of the ALGOL: Scott Stilianos (Ocean Duchess's MARAD Program Manager) and Steve Converse (Ocean Duchess's Port Engineer for the ALGOL) both testified that they were employed by Ocean Duchess, and Robert Sheen (Vice President of Operations for Ocean Duchess) testified he was employed by both Ocean Duchess and Ocean Ships, Inc., but Chief

1  Financial Officer John James testified that they were never employed by Ocean Duchess

2  and that they were all employed exclusively by Ocean Ship Management, Inc., a

3  previously undisclosed entity.  Opp. at 9.  This evidence that a different non-party

4  corporate entity employed these individuals does not demonstrate that Ocean

5  Shipholdings had a role in managing or operating the ALGOL.

6      Plaintiff offers no evidence to show that Ocean Shipholdings managed or operated

7  the ALGOL.  Plaintiff makes much of the admitted fact that Ocean Duchess, the ship

8  operator, used forms with the Ocean Shipholdings letterhead for safety meetings and

9  turnover letters, as well as a safety management system ("SMS") with the Ocean

10 Shipholdings brand, to demonstrate that Ocean Shipholdings was involved in the

11 management of the ALGOL.  Neidzwski Decl., Ex. 14 (RFA responses).  The use of

12 these standard forms and protocols by Ocean Duchess certainly demonstrates a

13 business relationship or affiliation between Ocean Duchess and Ocean Shipholdings, but

14 does not give rise to a reasonable inference that Ocean Shipholdings managed, operated

15 or maintained the ALGOL.  Reply at 10–13 (quoting Sheen Dep. at 178–81, 184–87).

16 Rather than showing involvement by Ocean Shipholdings in managing or operating the

17 ALGOL, the evidence shows that employees of Ocean Duchess filled out the forms with

18 the Ocean Shipholdings letterhead relating to the ALGOL, such as Chief Mate Davis's

19 turnover letter, and Ocean Duchess applied the safety protocols to the management and

20 operation of the ALGOL.  See Neidzwski Decl., Ex. 9 (Stilianos Dep.) at 125–26 ("I

21 looked through the [ ] OCM guide, and I didn't see where it gives a – a shelf life or a

22 service life to a line").  Furthermore, the Deputy Director for the MARAD Office of Ship

23 Operations testified that MARAD has a couple of different ship manager companies that

24 have parent companies, and that it is not unusual to see ship manager companies use

25 forms with the main company heading.  Kaufman-Cohen Decl., Ex. C (Simmons-Healy

26 Dep.) at 229–30.

27     Plaintiff also argues that Ocean Shipholdings owed a duty to plaintiff because it

28 received audit reports for the ALGOL.  Opp. at 8.  Plaintiff's counsel suggested that

1   Ocean Shipholdings itself was responsible for auditing the ALGOL's safety records, but

2   there is no evidence that Ocean Shipholdings conducted the audits or was negligent in

3   doing so.  As the government pointed out during oral argument, plaintiff did not submit

4   the audit reports and they are not part of the record before the court.  Accordingly,

5   plaintiff fails to demonstrate that Ocean Shipholdings had any role in managing or

6   operating the ALGOL in the role of an auditor.  Even if Ocean Shipholdings did act as an

7   auditor, plaintiff fails to show that Ocean Shipholdings would owe him a general duty of

8   care where plaintiff was not a client or intended beneficiary of an audit report.  See Bily v.

9   Arthur Young & Co., 3 Cal. 4th 370, 406 (1992) ("an auditor's liability for general

10  negligence in the conduct of an audit of its client financial statements is confined to the

11  client, i.e., the person who contracts for or engages the audit services.  Other persons

12  may not recover on a pure negligence theory."); Otto Candies, L.L.C. v. Nippon Kaiji

13  Kyokai Corp., 346 F.3d 530, 535 (5th Cir. 2003) (citing, inter alia, Bily, 3 Cal. 4th at 408–

14  09).

15       In the absence of evidence showing that Ocean Shipholdings had any role in

16  managing, maintaining or operating the ALGOL, Plaintiff fails to raise a triable issue

17  whether Ocean Shipholdings owed a duty in support of his claims of negligence and

18  gross negligence.

19              **b.      No Evidence to Show Ocean Shipholdings Caused Plaintiff's**

20                    **Injuries**

21       The government asserts generally that no act or omission by Ocean Shipholdings

22  contributed to, or caused, plaintiff's injuries.

23       Because the government has clarified its position that Ocean Shipholdings was

24  not plaintiff's employer, plaintiff's negligence claim arises under general maritime law and

25  not under the Jones Act, which requires a plaintiff to show only the "slightest causal

26  connection between the defendant's conduct and the plaintiff's injury."  The Dutra Group

27  v. Batterton, 139 S.Ct. 2275, 2292 n.8 (2019) (Ginsburg, J., dissenting) (citation and

28  internal marks omitted).  See Chan v. Soc'y Expeditions, Inc., 39 F.3d 1398, 1403 (9th

Cir. 1994) (recognizing that employee of cruise charter company had a general claim in admiralty for negligence arising from injury as a cruise ship passenger, and that adjudication of that claim is governed by federal common law). Even under the "slightest" causation standard under the Jones Act, plaintiff has not presented evidence to create a triable issue of causation as to Ocean Shipholdings to support a negligence or gross negligence claim.

To raise a triable issue of causation, plaintiff attributes the following acts or omissions to both Ocean Duchess and Ocean Shipholdings as the causes of the May 27, 2018, incident, but the evidence only shows that these factors are attributable to Ocean Duchess as the ALGOL's operator on behalf of the United States, not to Ocean Shipholdings.

1. Plaintiff asserts that the "primary and immediate cause of the May 27, 2018 incident was the failure of Ocean Duchess and Ocean Shipholdings to remove the subject line." Opp. at 16. Plaintiff contends that both Ocean Duchess and Ocean Shipholdings had a duty prior to May 27, 2018, to remove the mooring line at issue from service and failed to remove the subject line. The worn condition of the subject line would have been clear and noticeable for years prior to May 27, 2018, and the line should have been pulled from service as it posed a danger and risk of harm to the crew. Opp. at 16–17. The witnesses, however, only testified about the duty of Ocean Duchess, not Ocean Shipholdings, to remove worn lines from the ALGOL. ALGOL Chief Mate Ray Davis testified that he had authority to remove mooring lines from service and had done so in the past. Neidzwski Decl., Ex. 8 (Davis Dep.) at 114. Ocean Duchess's vice president of operations, Bob Sheen, also testified that even if no spare line was available, Ocean Duchess crew for any MARAD vessel would still have a duty not to use a line that is in noticeably poor condition. Neidzwski Decl., Ex. 2 (Sheen Dep.) at 99.

In its Incident Investigation Report, the Coast Guard found that the poor condition of the mooring lines on board the ALGOL was one of several causal

21

factors of the accident, finding that all lines on board the ALGOL were worn and deteriorated. Crawford Decl., Ex. G at SHAW2621. The Coast Guard did not, however, implicate Ocean Shipholdings, noting only that Ocean Duchess was the ship's operator.

Captain Pettibon also noted in his Investigation Report that "[t]he vessel was not maintaining a mooring line inventory record. The vessel did have a file that contained certificates for mooring lines received in the past, but mooring lines were not labeled and could not be associated with a certificate." Crawford Decl., Ex. F (Pettibon Report) at US001485. This is consistent with testimony (a) by Chief Mate Davis that before Ocean Duchess was awarded the contract for the ALGOL in 2012, Maersk was the previous ship manager for the ALGOL, Davis Dep. at 10; and (b) by the program manager for Ocean Duchess that "[t]here is no way to tie a certificate to a line" because "when ships have changed ship manager. . .we don't know anything prior to 2012 [about] stuff that was left behind [and] we don't know that these were the mooring lines that were out," Stilianos Dep. at 137.

2.  Plaintiff asserts that the failure to submit an emergent funding request to replace the old mooring lines in 2016, rather than through the normal business plan process, resulted in or contributed to the incident, where an emergent funding request would have likely provided Ocean Duchess with funding for new mooring lines for the ALGOL within 60 days of the request. Opp. at 17.

3.  Plaintiff asserts that inconsistent and inaccurate reporting of the condition of the ALGOL's mooring lines resulted in the subject line remaining in service on the date of the May 27, 2018, incident. Opp. at 18. In a May 14, 2018, turnover letter, Chief Mate Ray Davis described the deck and mooring equipment on the ALGOL as in "good order," which the MARAD Supervisory Contract Specialist, Melinda Simmons-Healy, agreed was not accurate. Neidzwski Decl., Ex. 4 (Simmons-Healy Dep. at 226–27). Plaintiff also represents that the audit

22

1    reports for the ALGOL for 2013, 2014, 2015, 2016 and 2018 fail to identify the

2    poor and dangerous condition of the mooring lines.  Opp. at 18.

3           4.     Plaintiff asserts that the failure by Ocean Duchess and Ocean

4    Shipholdings to require mooring line certificates, and failure to have a procedure to

5    document where mooring lines came from and how long they had been in service

6    for the ALGOL, contributed to the incident by allowing poor and worn mooring lines

7    to remain in service for years up through the date of the incident.  Opp. at 18–19.

8    The Coast Guard found that the failure to implement mooring records was a

9    causal factor contributing to the incident.  Crawford Decl., Ex. G at SHAW2622

10   (Coast Guard Incident Investigation Report) ("The vessel did not have a mooring

11   line maintenance policy in place and the SMS procedures for maintaining a

12   mooring line record did not include MARAD vessels under contract.").

13          5.     Plaintiff asserts that the failure by Ocean Duchess and/or Ocean

14   Shipholdings to discover the 2008 testing results for the ALGOL's mooring lines,

15   showing lines with a minimum breaking load of less than 75% of the original

16   minimum breaking load, contributed to the incident because such a discovery

17   should have resulted in a detailed evaluation of each of the ALGOL's mooring

18   lines and replacement of the lines years before the incident.  Opp. at 19.

19          6.     Failure to discover other incidents of snapped mooring lines, such as

20   a line for the CAPELLA in 2010 and a line for the ALGOL or CAPELLA in 2016,

21   contributed to the incident because inspections would have likely resulted in the

22   subject line being removed years prior to the incident.  Opp. at 19–20.

23   Even with the evidence viewed in the light most favorable to plaintiff, these factors

24   identified by plaintiff as causes of the incident are attributable to Ocean Duchess as the

25   ship's operator on behalf of the United States, not to Ocean Shipholdings, given the

26   absence of evidence that Ocean Shipholdings had any role in operating or maintaining

27   the ALGOL.

28          Plaintiff further points out that Ocean Shipholdings joined a management-level

1   meeting in response to the May 27, 2018, incident, and that the changes implemented for

2   the ALGOL included modifications to Ocean Shipholdings' safety management system

3   concerning maintenance of mooring lines.  Opp. at 15–16.  There is no dispute that after

4   the incident, both the Ocean Duchess investigator (Pettibon) and the Coast Guard

5   reported that the ALGOL was not maintaining a mooring line inventory record, and the

6   SMS guidelines for all eight MARAD ships managed by Ocean Duchess were updated to

7   include regular mooring line inspections and other protocols.  Stilianos Dep. at 144–45.

8          The update to the safety management system does not, however, raise a genuine

9   issue as to whether Ocean Shipholdings was responsible for the maintenance and

10  operation of the ALGOL.  Chief Mate Davis testified that even before the SMS protocols

11  were updated, it was the responsibility of Ocean Duchess to inspect the mooring lines,

12  and although there was "no directive in black and white to inspect our mooring lines . . .

13  we look at our mooring lines all the time."  Davis Dep. at 116.  To address the underlying

14  issue whether the Ocean Duchess owed a duty to implement a protocol for inspecting the

15  lines, the government points to evidence that MARAD has a preventative maintenance

16  program for the ALGOL and did not require Ocean Duchess to maintain mooring line

17  inventories or lines inspections prior to the date of the incident.  Reply at 5 n.2 (citing

18  Kaufman-Cohen Decl. ISO Reply, Ex. A (Converse Dep.) at 131).  The evidence relating

19  to the safety protocols for the ALGOL implicates Ocean Duchess's duty as the ship

20  operator, but do not demonstrate that Ocean Shipholdings had a duty to operate or

21  maintain the ALGOL.

22         Defendants have demonstrated that there is no genuine issue of material fact as to

23  plaintiff's claims against Ocean Shipholdings, and that Ocean Shipholdings is entitled to

24  summary judgment.

25  **C.     Objection by the United States to Crawford Declaration**

26         In its reply, the United States objected to the declaration of plaintiff's liability

27  expert, Thomas Crawford, on the ground generally that plaintiff did not timely disclose

28  him as an expert.  Reply at 3.  Plaintiff responded to this objection by submitting evidence

1    that Crawford was disclosed as an expert in February 2019 when he conducted his

2    investigation, and that plaintiff's counsel exchanged expert disclosures on December 30,

3    2019, which was the deadline agreed to by the parties.  The court grants plaintiff's

4    request for leave to file supplemental evidence in response to the government's

5    objection, dkt. 66, and overrules the objection to the Crawford declaration on the ground

6    of untimely disclosure.

7         The United States also objects to specific assertions in the Crawford Declaration

8    to the extent he is not an expert on the operation of MARAD vessels, particularly on how

9    MARAD funds its vessels and the protocol for emergent funding, and is not an expert on

10    the legal issues of agency or corporate law, on which he opines by concluding that

11    Ocean Shipholdings was involved in the management of the ALGOL and subject to

12    liability for plaintiff's claims.  Reply at 3–4.  Plaintiff did not respond to those objections as

13    to the scope of Crawford's expert opinion.

14        The government's objections to specific statements in the Crawford Declaration

15    addressing the operation and funding of MARAD vessels, and the corporate relationship

16    of Ocean Duchess and Ocean Shipholdings, are SUSTAINED on the grounds that

17    Crawford lacks specialized knowledge and that these opinions do not help the court

18    understand the evidence or determine a fact in issue.  FRE 702.  The government does

19    not object to the Crawford opinions addressing the conditions of the mooring line and the

20    circumstances of the incident where the mooring line snapped, about which he has

21    specialized knowledge as a master on different types of vessels and experience

22    supervising about 2,500 mooring operations and conducting thousands of mooring line

23    inspections.

24                                    **CONCLUSION**

25        For the reasons set forth above, defendants' motion for summary judgment is

26    **GRANTED** on all claims against Ocean Duchess and Ocean Shipholdings.  The case will

27    proceed on the three remaining claims against the United States: Jones Act negligence,

28    unseaworthiness, and failure to pay maintenance, cure and wages.  By separate order,

the parties will be directed to participate in a mandatory settlement conference to occur

before pretrial papers are filed.

**IT IS SO ORDERED.**

Dated: January 30, 2020

            /s/ *Phyllis J. Hamilton*

            PHYLLIS J. HAMILTON
            United States District Judge

United States District Court
Northern District of California